IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GLENDORA MANAGO,<br>6474 Bricktown Circle<br>Glen Burnie, MD 21061<br>(Anne Arundel County)<br>*individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>  v.<br><br>CANE BAY PARTNERS VI, LLLP,<br>2205 Church Street, Suite 305<br>Christiansted, U.S. Virgin Islands 00820,<br><br>  Serve on:<br>  Registered Agent<br>  Alexander Hamilton Trust Co., LLC<br>  53a Company Street,<br>  Christiansted, U.S. Virgin Islands 00820<br><br>DAVID JOHNSON<br>2205 Church Street, Suite 305<br>Christiansted, U.S. Virgin Islands 00820,<br><br>KIRK CHEWNING,<br>2205 Church Street, Suite 305<br>Christiansted, U.S. Virgin Islands 00820<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COME NOW Plaintiff Glendora Manago, *on behalf of herself and all individuals similarly situated*, by counsel, and for her Class Action Complaint against Defendants, alleges as follows:

### GENERAL ALLEGATIONS

1. This is a case about a scheme to make online short-term loans that carry triple-digit interest rates, often exceeding 800%, and that are illegal in many states.

2. High interest loans often target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3. In recent years, online lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws, including the "off-shore" scheme and the "tribal" or "sovereign" lending scheme.

4. In the so-called "off-shore model," the lender is purportedly located off-shore, such as in Belize, but in reality, the lender operates in the United States. The purpose of the off-shore model is to attempt to evade the usury laws and discourage regulators by purportedly operating outside the United States.

5. In 2013, the Department of Justice initiated "Operation Chokepoint" which investigated banks that did business with companies that the DOJ believed to be at high-risk for fraud and money laundering. As a result of Operation Chokepoint, the off-shore model of lending significantly declined as lenders could not find banks or payment processors willing to do business with a purportedly off-shore online lending business. Since Operation Chokepoint, online lenders have transitioned to tribal lending schemes.

6. In a tribal lending scheme, the lender affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws.

7. The purpose of the scheme is so that the non-tribal schemers "can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

8. Tribal lending schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state usury law, with the vast majority of the revenues going to non-tribal entities, with tribes receiving one or two percent of the revenue.

9. In a tribal lending scheme, the tribe sets up a company that purportedly makes the loans while entering into an agreement with a servicing or consulting company that controls the entire business and retains the vast majority of the revenue from the scheme, leaving the tribe with 1% or 2% of the revenue.

10. In recent years, these schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending laws.[1]

11. In this case, non-tribe members David Johnson and Kirk Chewning and their company Cane Bay Partners VI, LLLP ("Cane Bay") ran the lender Makes Cents, Inc d/b/a MaxLend ("MaxLend"), a purportedly tribal entity in North Dakota that makes usurious loans to persons located throughout the United States.

12. Johnson and Chewning and their company Cane Bay have been running lending schemes for years. These schemes have been highly lucrative. According to Bloomberg News, Johnson owns a 65-foot yacht called *Living the Dream.* Johnson owns a 49-foot yacht called *Renewed Interest.*

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

13. Plaintiff, on behalf of herself and the Classes set forth below, seeks to recover damages and penalties under state and federal law for the usurious interest and fees obtained by Defendants.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15. This Court also has jurisdiction under the Class Action Fairness Act because Plaintiff is a citizen of Maryland, at least one Defendant is not a citizen of Maryland, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Maryland, including in this District and Division. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

## THE PARTIES

17. Plaintiff Glendora Manago is a natural person and resident of Glen Burnie, Maryland.

18. Defendant Kirk Chewning is a natural person and resident of the U.S. Virgin Islands.

19. Defendant David Johnson is a natural person domiciled in the U.S. Virgin Islands.

20. Cane Bay Partners VI, LLLP is a limited liability limited partnership based in the U.S. Virgin Islands. Chewning and Johnson are the co-founders and officers at Cane Bay Partners.

# STATE USURY AND CONSUMER PROTECTION LAWS[2]

21. Maryland law prevents usurious lending.

22. Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

23. Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection." Defendants and MaxLend have never been licensed to make loans in Maryland or any other state.

24. If an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

25. Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any principal, interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

---

[2] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

26. Indeed, a knowing violation of Maryland's lending laws is a crime. Md. Code, Comm. Law § 12-316.

**DEFENDANTS' SCHEME TO AVOID USURY LAWS**

27. Johnson and Chewning have a long history in online lending.

28. In 2009, Johnson and Chewning organized Cane Bay in the Virgin Islands. According to Bloomberg News, ex-employees of Cane Bay said that Cane Bay had no other business other than running online lenders.

29. Johnson and Chewning organized Cane Bay for the purpose of evading state usury laws, and collecting illegal interest on short-term loans from consumers located throughout the United States, including in Maryland.

30. Johnson and Chewning were owners of Hong Kong Partners which made online loans supposedly from Belize under the names "Cash Yes" and "Cash Jar." Hong Kong Partners was shut down after Operation Chokepoint.

31. Johnson and Chewning were also both executives at TranDotCom, an information system technology company that keeps records for online payday lenders, including records regarding outstanding loans, their terms, and payment histories. TranDotCom is currently affiliated with Strategic Link Consulting, where Johnson and Chewning are owners.

32. Strategic Link Consulting offers to provide "turnkey" "lending solutions" to payday lenders. It claims to be powered by "TranDotCom technology," including "marketing," "underwriting," "risk management," "auto payment and support," "rehabilitation of consumer debt," "financial reporting," "legal and compliance," "portfolio management," "and a "contact center." http://www.slchq.com/turnkey-solution/ (last accessed April 7, 2020).

33. Rather than complying with state lending and licensing requirements, Defendants entered into a tribal lending scheme with the Mandan, Hidatsa, and Arikara Nations (collectively,

the "MHA Nation" or the "Tribe"). The Mandan, Hidatsa, and Arikara are three Native American tribes located on the Fort Berthold Reservation in a remote area of North Dakota.

34. MHA Nation holds itself out as the tribal lender through its tribal company MaxLend.

35. MaxLend offers high-interest short term loans that charge up to 841.4532% annual interest on short term loans up to $2,500. https://www.maxlend.com/index.aspx. These loans have interest rates that exceed more than two times any state interest caps.

36. Although MaxLend purports to be an entity controlled by the MHA Nation on its website and its contracts, in reality, MaxLend is merely a front for Johnson's and Chewning's business which is operated through non-tribal entity Cane Bay Partners and other non-tribal companies associated with Johnson and Chewning.

37. Johnson, Chewning, Cane Bay, and other entities affiliated with Johnson and Chewning, run the lending business, including securing funding, registering domains, designing the websites, marketing the business, underwriting and approving loans, and analyzing returns to adjust the lending algorithms. The MHA Nation has little meaningful involvement in the business.

38. By 2011, Johnson, Chewning, and Cane Bay had approached the MHA Nation to set up online lending websites.

39. According to publicly available tribal meeting minutes, in December 2011, Makes Cents, Inc. was organized as a tribal company. Makes Cents operates under the name "MaxLend." The same day, the Tribe also organized another company called First Cents, Inc. which was a wholly owned subsidiary of Makes Cents, Inc.

40. MHA Nation also authorized a "Referral Agreement" between Makes Cents Inc., First Cents Inc., and TranDotCom Solutions for TranDotCom to engage in marketing and advise and assist with regard to the development of the lending business.

41. Cane Bay has been involved in the scheme since its inception. This is evidenced by the fact that, as early as 2011, the Tribal council considered a non-disclosure agreement between Makes Cents and "Cain Bay."

42. Also, in December 2011, the Tribe authorized a loan from "No Non Cents LLC," a Delaware non-tribal corporation, for $5 million to fund the lending business. No Non Cents LLC was also provided a deposit access control agreement which gave the non-tribal company No Non Cents control over Makes Cents' bank accounts.

43. No later than 2013, the Tribe entered into an agreement with Cane Bay to provide "management consulting, service provider analysis, and risk management services" to Makes Cents, Inc. and to operate a number of lending websites.

44. Through Cane Bay and TranDotCom, Johnson and Chewning directed the operation of the Tribe's lending websites sites, including Maxlend.com through which loans were purportedly offered by Makes Cents, Inc.

45. Cane Bay secured funding for its operations through investment from fund Vector Capital IV.

46. Johnson and Chewing also own M. Mark High Ltd., which is an internet marketing company that is currently marketing MaxLend loans through affiliate internet marketing.

47. The current Chief Portfolio Officer of Makes Cents, Darin Thomason, lives in Southland, Texas, and does not appear to have any ties to the MHA Nation. Mr. Thomason also

handles customer service functions, including responding to complaints regarding MaxLend on the Better Business Bureau website.

48. Discovery will show that the MHA Nation receives little financial benefit from the lending scheme. For instance, Johnson, Chewning, and Cane Bay have established similar lending schemes with other tribes, including with Lac Courte Oreilles Band of Lake Superior Chippewa with whom Cane Bay entered into a servicing agreement in 2014 along with various other companies owned by Chewning and Johnson. The Lac Courte Oreilles tribe receives only 1.8% of the revenue generated from the business. Discovery will show that MHA Nation receives a similarly small percentage of the revenue generated from loans made through MaxLend.

**PLAINTIFF'S EXPERIENCE**

49. From her residence in Glen Burnie, Maryland, Plaintiff Glendora Manago applied for and took out a loan with MaxLend over the internet in February 2019.

50. The loan was for $400 and had an interest rate of 605.58%. According to the payment schedule, the finance charge on the loan was $1,436.20. After the first month, the monthly payment on the loan was $209.34. Plaintiff paid the full amount on the loan, paying a total of $1,836.20 for a $400 loan.

51. In December 2019, Plaintiff took out another loan from MaxLend for $600. The interest rate on that loan was 581.89% and the finance charge is $2,091.89. Under Maryland law, the loan was void from inception. Plaintiff has since revoked her authorization to allow MaxLend access to her bank account.

**CLASS ACTION ALLEGATIONS**

52. Plaintiff asserts claims on behalf of the proposed National Class defined as follows:

> All United States residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the four years preceding the filing of this complaint to the date that the class list is created. This

Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

53. Plaintiff assert claims on behalf of the proposed Maryland Class defined as follows:

All Maryland residents from whom Defendants collected or attempted to collect loans and/or who engaged in a loan transaction with Defendants in the three years preceding the filing of this complaint to the date that the class list is created.

### A. Numerosity

54. There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

### B. Commonality

55. There are numerous common questions of law and fact common to Plaintiff and the members of the Classes. These questions include, but are not limited to, the following:

   a. Whether Defendants violated Maryland's usury law;

   b. Whether Defendants are protected by tribal sovereign immunity;

   c. Whether Defendants engaged in unfair or deceptive acts or practices;

   d. Whether Defendants constitute an "enterprise" under RICO;

   e. Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law;

   f. The proper measure and amount of damages for the Classes.

### C. Typicality

56. Plaintiff's claims are typical of the claims of the Classes she seeks to represent. Plaintiff, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiff's claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

### D. Adequacy

57. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating rent-a-tribe cases. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor her counsel have interests that conflict with the Classes.

### E. Injunctive Relief

58. The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

### F. Predominance and Superiority

59. The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a. Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b. It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c. A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d. The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e. Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against All Defendants)**

60. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

61. Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

62. The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Cane Bay, MaxLend, and Defendants' other companies involved in the scheme are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender MaxLend.

63. The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

64. Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

65. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

66. All of the loans made to the National Class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate in their respective states.

67. Plaintiff and the National Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

68. This conduct began at the latest in 2013 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in Maryland and other states with similar usury laws.

69. Accordingly, Defendants are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against All Defendants)**

70. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

71. Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

72. The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Cane Bay and MaxLend, are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender MaxLend.

73. The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

74. Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

75. This conduct began at the latest in 2013 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in Maryland and other states with similar usury laws.

76. Accordingly, Defendants are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION
**Violations of Maryland Consumer Loan Law**
**(On Behalf of Plaintiff and the Maryland Class)**
**(Class Claims against All Defendants)**

77. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

78. Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

(i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;

(ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan

Md. Code, Com. Law § 12-306(a)(6).[3]

79. Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

80. As set forth more fully above, in the course of making and collecting on loans to Plaintiff and other consumers in Maryland, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

81. Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff and Maryland Class members.

82. Defendants' violations were willful and intentional.

83. Plaintiff and the Maryland Class are entitled to recover from Defendants any principal, interest, or other charges with respect to the loans, and any exemplary or treble damages as provided by law..

---

[3] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time." Md. Code, Com. Law § 12-306.

**FOURTH CAUSE OF ACTION**
**Violation of Maryland Consumer Protection Act**
**(On Behalf of Plaintiff and the Maryland Class)**
**(Class Claims against All Defendants)**

84. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

85. Maryland law prohibits "unfair, abusive, or deceptive trade practices" in the extension of consumer credit. Md. Code, Comm. Law. § 13-303.

86. Unfair, abusive, or deceptive trade practices include the "failure to state a material fact if the failure deceives or tends to deceive." Md. Code., Comm. Law § 13-301(3).

87. By omitting that Defendants' loans are illegal in Maryland, Defendants violated the Maryland Consumer Protection Act.

88. Defendants are thus liable to Plaintiff and the Maryland Class members for their actual damages and attorneys' fees. Md. Code, Comm. Law § 13-408.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against All Defendants)**

89. To the detriment of Plaintiff and the National Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Class members.

90. As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff seeks a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## SIXTH CAUSE OF ACTION
## CIVIL CONSPIRACY
### (On Behalf of Plaintiff and the National Class)
### (Class Claims against All Defendants)

91. All of the loans to consumers made in the name of Defendants' lending company MaxLend violated Plaintiff and the National Class members' respective states' interest rates and lending laws.

92. Defendants conspired amongst themselves to violate state usury and lending laws and profit from those violations.

93. Accordingly, on behalf of herself and the members of the National Class, Plaintiff seeks to recover from Defendants, jointly and severally, all amounts repaid on any loans with Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B. An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C. An Order declaring that Defendants have committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate;

E. An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H. An Order awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees; and

I. Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

/s/Martin E. Wolf
Martin E. Wolf, (Bar No. 09425)
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

BERGER MONTAGUE PC
E. Michelle Drake*
John G. Albanese*
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net
*pro hac vice forthcoming

*Attorneys for Plaintiff and Proposed Class*