## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GLENDORA MANAGO,

KAREN PETERSON
4265 Willow Brook Circle
West Palm Beach, FL 33417,

DIANA COSTA
4627 Taray Lane
Holiday, FL 34690,

COLLEEN HUNTER
12010 Panay Drive
Houston, TX 77048,

SHARON DAVIS
724 Holmes Street
Salisbury, NC 28144,

LESLIE TURNER
3439 NE Sandy Blvd,
Portland, OR 97232,

CAMILLA VERNON
25555 Lahser Rd.
Southfield, MI 48033,

LASHAUNYA MORRIS
351 Tannenbaum Rd.
Ravenel, SC 29470,

*individually and on behalf of all others similarly
situated*,

            Plaintiffs,

      v.

CANE BAY PARTNERS VI, LLLP,
DAVID JOHNSON, KIRK
CHEWNING,

RICHARD MAYER, CHIEF OPERATING
OFFICER OF MAKES CENTS, INC. & CHIEF

|  |
|---|
| Case No. 1:20-cv-00945-ELH |
| |
| **FIRST AMENDED CLASS ACTION COMPLAINT** |
| |
| **JURY TRIAL DEMANDED** |

EXECUTIVE OFFICER OF UETSA TSAKITS,
INC., *in his official capacity*,
217 3rd Avenue NE
Parshall, ND 58770

MARK FOX, CHAIRMAN OF MHA NATION
TRIBAL BUSINESS COUNCIL, *in his official
capacity*,
404 Frontage Road
New Town, ND 58763

CORY SPOTTED BEAR, VICE CHAIRMAN
OF MHA NATION TRIBAL BUSINESS
COUNCIL, *in his official capacity*,
404 Frontage Road
New Town, ND 58763

SHERRY TURNER-LONE FIGHT,
COUNCILWOMAN OF MHA NATION
TRIBAL BUSINESS COUNCIL, *in her official
capacity*,
404 Frontage Road
New Town, ND 58763

MERVIN PACKINEAU, TREASURER-
COUNCILMAN OF MHA NATION TRIBAL
BUSINESS COUNCIL, *in his official capacity*,
404 Frontage Road
New Town, ND 58763

V. JUDY BRUGH, COUNCILMAN OF MHA
TRIBAL BUSINESS COUNCIL, *in his official
capacity*,
404 Frontage Road
New Town, ND 58763

FRED FOX, SECRETARY-COUNCILMAN
OF MHA TRIBAL BUSINESS COUNCIL, *in
his official capacity*,
404 Frontage Road
New Town, ND 58763

MONICA MAYER, COUNCILWOMAN OF
MHA TRIBAL BUSINESS COUNCIL, *in her
official capacity*,
404 Frontage Road

New Town, ND 58763

KAREN RABBITHEAD, MEMBER OF
BOARD OF DIRECTORS OF UETSA
TSAKITS, INC., *in her official capacity*,
217 3rd Avenue NE
Parshall, ND 58770

DAVID BLACKSMITH, MEMBER OF
BOARD OF DIRECTORS OF UETSA
TSAKITS, INC., *in his official capacity*,
217 3rd Avenue NE
Parshall, ND 58770

WESLEY SCOTT EILSON, MEMBER OF
BOARD OF DIRECTORS OF UETSA
TSAKITS, INC., *in his official capacity*,
217 3rd Avenue NE
Parshall, ND 58770

                    Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs Glendora Manago, Karen Peterson, Diana Costa, Colleen Hunter, Sharon Davis, Leslie Turner, Camilla Vernon, and Lashaunya Morris, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online short-term loans that carry triple-digit interest rates, often exceeding 800%, and that are illegal in many states.

2.      High interest loans often target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities.  Consumers often take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.     In recent years, online lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws, including the "off-shore" scheme and the "tribal" or "sovereign" lending scheme.

4.     In the so-called "off-shore model," the lender is purportedly located off-shore, such as in Belize, but in reality, the lender operates in the United States.  The purpose of the off-shore model is to attempt to evade the usury laws and discourage regulators by purportedly operating outside the United States.

5.     In 2013, the Department of Justice initiated "Operation Chokepoint" which investigated banks that did business with companies that the DOJ believed to be at high-risk for fraud and money laundering.  As a result of Operation Chokepoint, the off-shore model of lending significantly declined as lenders could not find banks or payment processors willing to do business with a purportedly off-shore online lending business.  Since Operation Chokepoint, online lenders have transitioned to tribal lending schemes.

6.     In a tribal lending scheme, the lender affiliates with a Native American tribe to attempt to enhance the appearance of tribal ownership and insulate the scheme from federal and state law by piggy-backing on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws.

7.     The purpose of the scheme is so that the non-tribal schemers "can use tribal immunity as a shield for conduct of questionable legality."  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

8. Tribal lending schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state usury law, with the vast majority of the revenues going to non-tribal entities, and tribes receiving one or two percent of the revenue.

9. In a tribal lending scheme, the tribe sets up a company that purportedly makes the loans while entering into an agreement with a servicing or consulting company that controls the entire business and retains the vast majority of the revenue from the scheme, leaving the tribe with one or two percent of the revenue.

10. In recent years, these schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending law offenses.[1]

11. In this case, non-tribe members David Johnson and Kirk Chewning and their company Cane Bay Partners VI, LLLP (collectively, the "Cane Bay Defendants") ran the lender Makes Cents, Inc. d/b/a MaxLend ("MaxLend"), a purportedly tribal entity of the Mandan, Hidatsa, and Arikara Nation (collectively, the "MHA Nation" or the "Tribe") in North Dakota that makes usurious loans to persons located throughout the United States.

12. Johnson and Chewning and their company Cane Bay have been running lending schemes for years. These schemes have been highly lucrative. According to Bloomberg News, Johnson owns a 65-foot yacht called *Living the Dream.* Johnson owns a 49-foot yacht called *Renewed Interest.*

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

13.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for the usurious interest and fees obtained by Cane Bay Defendants, as well as prospective injunctive and declaratory relief against the MHA Tribal Business Council, and the Board of Directors and Chief Executive Officer of Uetsa Tsakits, Inc.[2] (collectively, the "Tribal Defendants") to prevent their continuous and ongoing violations of state and federal law.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

15.     This Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff Manago's claims occurred in Maryland, including in this District and Division.  Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

## THE PARTIES

17.     Plaintiff Glendora Manago is a natural person and resident of Glen Burnie, Maryland.

---

[2] Uetsa Tsakits is the tribal entity that has allegedly owned the MaxLend portfolio since 2019 and will begin operating MaxLend by the end of 2020.  (*See* ECF No. 25-2 ("Mayer Decl.") ¶¶ 26–27.)

18.     Plaintiff Karen Peterson is a natural person and resident of West Palm Beach, Florida.

19.     Plaintiff Diana Costa is a natural person and resident of Holiday, Florida.

20.     Plaintiff Colleen Hunter is a natural person and resident of Houston, Texas.

21.     Plaintiff Sharon Davis is a natural person and resident of Salisbury, North Carolina.

22.     Plaintiff Leslie Turner is a natural person and resident of Portland, Oregon.

23.     Plaintiff Camilla Vernon is a natural person and resident of Southfield, Michigan.

24.     Plaintiff Lashaunya Morris is a natural person and resident of Ravenel, South Carolina.

25.     Defendant Kirk Chewning is a natural person and resident of the U.S. Virgin Islands.

26.     Defendant David Johnson is a natural person domiciled in the U.S. Virgin Islands.

27.     Cane Bay Partners VI, LLLP is a limited liability limited partnership based in the U.S. Virgin Islands.  Chewning and Johnson are the co-founders and officers at Cane Bay Partners.

28.     Defendant Richard Mayer is a member of the MHA Nation and serves as the current Chief Operating Officer of Makes Cents, Inc. and as Chief Executive Officer of Uetsa Tsakits, Inc. Plaintiffs seek relief from Defendant Mayer in his official capacity only.

29.     Defendant Mark Fox is a member of the MHA Nation and serves as the current Chairman of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Fox in his official capacity only.

30.     Defendant Cory Spotted Bear is a member of the MHA Nation and serves as the current Vice Chairman of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Spotted Bear in his official capacity only.

31.     Defendant Sherry Turner-Lone Fight is a member of the MHA Nation and serves as a member of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Turner-Lone Fight in her official capacity only.

32.     Defendant Mervin Packineau is a member of the MHA Nation and serves as the current Treasurer for the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Packineau in his official capacity only.

33.     Defendant V. Judy Brugh is a member of the MHA Nation and serves as a member of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Brugh in his official capacity only.

34.     Defendant Fred Fox is a member of the MHA Nation and serves as the current Secretary of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Fox in his official capacity only.

35.     Defendant Monica Mayer is a member of the MHA Nation and serves as a member of the MHA Nation Tribal Business Council.  Plaintiffs seek relief from Defendant Mayer in her official capacity only.

36.     Defendant Karen Rabbithead is a member of the MHA Nation and serves on the Board of Directors of Uetsa Tsakits, Inc.  Plaintiffs seek relief from Defendant Rabbithead in her official capacity only.

37.     Defendant David Blacksmith is a member of the MHA Nation and serves on the Board of Directors of Uetsa Tsakits, Inc.  Plaintiffs seek relief from Defendant Blacksmith in his official capacity only.

38.     Defendant Wesley Scott Eilson is a member of the MHA Nation and serves on the Board of Directors of Uetsa Tsakits, Inc.  Plaintiffs seek relief from Defendant Eilson in his official capacity only.

### STATE USURY AND CONSUMER PROTECTION LAWS[3]

**Maryland**

39.     Maryland law prevents usurious lending.

40.     Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

41.     Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."  Defendants and MaxLend have never been licensed to make loans in Maryland or any other state.

42.     If an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans.  Md. Code, Com. Law § 12-314.

---

[3] Usury laws are not unique to the United States of America.  Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012).  Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country."  Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

43.     Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any principal, interest, fees, or charges on the loans.  Md. Code, Com. Law § 12-314.

44.     Indeed, a knowing violation of Maryland's lending laws is a crime.  Md. Code, Comm. Law § 12-316.

**Florida**

45.     In Florida, the maximum allowable rate of interest on loans of $500,000 or less is 18%.  Fla. Stat. § 687.03.

46.     Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of 25%.  Fla. Stat. § 687.071.  Loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature."  *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

47.     Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable.  Fla. Stat. § 516.02(1-2).

48.     Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans.  Fla. Stat. § 687.04.

49.     Defendants and Maxlend were never licensed to make consumer loans in Florida.

**Texas**

50.     Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%.  Tex. Fin. Code § 302.001.

51.     Texas law requires persons issuing consumer loans to obtain a license.  Tex. Fin. Code § 342.051.  Under certain conditions, licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner.  *Id.* § 342.201.

52.     Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20% of the principal.  Tex. Fin. Code § 305.001.

53.     Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees.  Tex. Fin. Code § 305.002.

54.     Defendants and Maxlend were never licensed to make loans to Texas consumers.

**North Carolina**

55.     In North Carolina, the legal interest rate chargeable to consumers is 8%.  N.C. Gen. Stat. § 24-1.

56.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

57.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest.  N.C. Gen. Stat. § 24-2.  If the interest has been paid, the borrower may recover twice the amount of interest paid.  *Id.*

58.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

59.     Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id*. § 53-166(d).

60.     Defendants and Maxlend were never licensed to make loans in North Carolina.

**Oregon**

61.     The legal rate of interest in Oregon is 9% per annum.  ORS 82.010(1).

62.     No lenders may make consumer finance loans of under $50,000, unless that person is licensed by the state.  ORS 725.045.

63.     Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest.  ORS 725.045(1)(b).

64.     If a lender is licensed, it may make consumer finance loans, but the annual interest rate is capped at 36%.  ORS 725.340.

65.     Defendants and Maxlend were never licensed to make loans in Oregon.

**Michigan**

66.     Under Michigan law, the legal rate of interest is 5%.  MCL 438.31.  In cases where the parties stipulate in writing for the payment of interest, the legal rate of interest shall not exceed 7%.  *Id.*

67.     Pursuant to MCL 438.32, lenders that charge interest at a rate that exceeds 7% are barred from recovering any "interest, any official fees, delinquency or collection charge, attorney fees or court costs" and the borrower is entitled to recover attorney fees and court costs from the lender.

68.     In Michigan, criminal usury results when a person, not being authorized or permitted by law to do so, knowingly charges interest at a rate that exceeds 25%.  MCL 438.41.

69.     The penalty for any person guilty of criminal usury is imprisonment for a term not to exceed 5 years or a fine of not more than $10,000, or both.  MCL 438.41.  The possession of usurious loan records is also prohibited by Michigan law.  MCL 438.42.  A person commits the offense of possession of usurious loan records "when, with knowledge of the contents thereof, he possesses any writing, paper, instrument or article used to record criminally usurious transactions" that are prohibited by law.  *Id*.  The penalty is imprisonment up to one year or a fine of not more than $1,000, or both.  *Id*.

70.     In Michigan, the Deferred Presentment Service Transactions Act ("DPSTA") regulates lenders that provide short-term loans to consumers up to $600.  MCL 487.2121, *et seq*.

71.     Entities that are engaged in such lending must apply and receive a license to issue short-term loans.  MCL 487.2131.

72.     Any person who violates the DPSTA is subject to "a civil fine of not less than $1,000.00 or more than $10,000.00 for each violation."  MCL 487.2168.  A person who knew or reasonably should have known of the violation is subject to "a civil fine of not less than $5,000.00 or more than $50,000.00 for each violation."  *Id*.

73.     Defendants and Maxlend were never licensed to make loans in Oregon.

**South Carolina**

74.     Under South Carolina law, a consumer loan is a "loan made by a person regularly engaged in the business of making loans in which the debtor is a person," "the debt in incurred primarily for a personal, family, or household purpose"; "the debt is payable in installments or a loan finance charge is made"; and "either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land."  S.C. Code § 37-3-104.

75.     For lenders that are not a supervised lender, the maximum finance charge is 12% annually.  S.C. Code § 37-3-201.  Supervised lenders are those that are licensed and regulated by the South Carolina Consumer Finance Division.

76.     Defendants and Maxlend were never licensed in South Carolina to make loans.

## DEFENDANTS' SCHEME TO AVOID USURY LAWS

77.     Johnson and Chewning have a long history in online lending.

78.     In 2009, Johnson and Chewning organized Cane Bay in the Virgin Islands. According to Bloomberg News, ex-employees of Cane Bay said that Cane Bay had no other business other than running online lenders.

79.     Johnson and Chewning organized Cane Bay for the purpose of evading state usury laws, and collecting illegal interest on short-term loans from consumers located throughout the United States, including in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina.

80.     Johnson and Chewning were owners of Hong Kong Partners which made online loans supposedly from Belize under the names "Cash Yes" and "Cash Jar."  Hong Kong Partners was shut down after Operation Chokepoint.

81.     Johnson and Chewning were also both executives at TranDotCom, an information system technology company that keeps records for online payday lenders, including records

regarding outstanding loans, their terms, and payment histories.  TranDotCom is currently affiliated with Strategic Link Consulting, where Johnson and Chewning are owners.

82.     Strategic Link Consulting offers to provide "turnkey" "lending solutions" to payday lenders.   It claims to be powered by "TranDotCom technology," including "marketing," "underwriting," "risk management," "auto payment and support," "rehabilitation of consumer debt," "financial reporting," "legal and compliance," "portfolio management," "and a "contact center."  http://www.slchq.com/turnkey-solution/ (last accessed April 7, 2020).

83.     Rather than complying with state lending and licensing requirements, Cane Bay Defendants entered into a tribal lending scheme with the Mandan, Hidatsa, and Arikara Nation. The Mandan, Hidatsa, and Arikara are three Native American tribes located on the Fort Berthold Reservation in a remote area of North Dakota.

84.     MHA Nation holds itself out as the tribal lender through its tribal company MaxLend.

85.     MaxLend offers high-interest short term loans that charge up to 841.4532% annual interest on short term loans up to $2,500.  https://www.maxlend.com/index.aspx.  These loans have interest rates that exceed more than two times any state interest caps.  These loans are purportedly governed by tribal law and require arbitration or dispute resolution proceedings to be conducted under tribal law.

86.     Although MaxLend purports to be an entity controlled by the MHA Nation on its website and in its contracts, in reality, MaxLend is merely a front for Johnson's and Chewning's business which is operated through non-tribal entity Cane Bay Partners and other non-tribal companies associated with Johnson and Chewning.

87.     Johnson, Chewning, Cane Bay, and other entities affiliated with Johnson and Chewning, run the lending business, including securing funding, registering domains, designing the websites, marketing the business, underwriting and approving loans, and analyzing returns to adjust the lending algorithms.  The MHA Nation has little meaningful involvement in the business.

88.     By 2011, Johnson, Chewning, and Cane Bay had approached the MHA Nation to set up online lending websites.

89.     According to publicly available tribal meeting minutes, in December 2011, Makes Cents, Inc. was organized as a tribal company owned entirely by the Tribe through one of its wholly-owned subsidiaries.  Makes Cents operates under the name "MaxLend."  The same day, the Tribe also organized another company called First Cents, Inc., which was a wholly owned subsidiary of Makes Cents.

90.     MHA Nation also authorized a "Referral Agreement" between Makes Cents, First Cents, and TranDotCom Solutions for TranDotCom to engage in marketing and advise and assist with regard to the development of the lending business.

91.     Cane Bay has been involved in the scheme since its inception.  This is evidenced by the fact that, as early as 2011, the MHA Nation Tribal Business Council considered a non-disclosure agreement between Makes Cents and "Cain Bay."

92.     Also, in December 2011, the Tribe authorized a loan from "No Non Cents LLC," a Delaware non-tribal corporation, for $5 million to fund the lending business.  No Non Cents LLC was also provided a deposit access control agreement which gave the non-tribal company No Non Cents control over Makes Cents' bank accounts.

93.     In 2012, the Tribal Business Council transferred ownership of Makes Cents from MHA Systems to the Nation directly.  (Mayer Decl. ¶ 23.)

94.     In October 2013, Makes Cents purchased the MaxLend portfolio in a seller-financed sale.  (*Id.* ¶ 36.)   The identity of the seller and the terms of the transaction remain undisclosed.  (*See generally id.*)

95.     Also no later than 2013, the Tribe entered into an agreement with Cane Bay to provide "management consulting, service provider analysis, and risk management services" to Makes Cents and to operate a number of lending websites.

96.     Through Cane Bay and TranDotCom, Johnson and Chewning directed the operation of the Tribe's lending websites sites, including Maxlend.com through which loans were purportedly offered by Makes Cents.

97.     Cane Bay secured funding for its operations through investment from fund Vector Capital IV.

98.     Johnson and Chewing also own M. Mark High Ltd., which is an internet marketing company that is currently marketing MaxLend loans through affiliate internet marketing.

99.     The current Chief Portfolio Officer of Makes Cents, Darin Thomason, lives in Southland, Texas, and does not appear to have any ties to the MHA Nation.  Mr. Thomason also handles customer service functions, including responding to complaints regarding MaxLend on the Better Business Bureau website.

100.     Discovery will show that although MaxLend serves as the nominal lender of the loans, the MHA Nation receives little financial benefit from the lending scheme.  For instance, Johnson, Chewning, and Cane Bay have established similar lending schemes with other tribes, including with Lac Courte Oreilles Band of Lake Superior Chippewa with whom Cane Bay entered into a servicing agreement in 2014 along with various other companies owned by Chewning and Johnson.  The Lac Courte Oreilles tribe receives only 1.8% of the revenue generated from the

business. Discovery will show that MHA Nation receives a similarly small percentage of the revenue generated from loans made through MaxLend.

**TRIBAL DEFENDANTS' ROLE IN THE ENTERPRISE**

101.    The Tribal Business Council serves as the governing body for the MHA Nation and has the power to make laws and resolutions pursuant to the Constitution and By Laws of the Three Affiliated Tribes.

102.    Pursuant to Article VI, Section 5 of the Constitution of the Three Affiliated Tribes, the Tribal Business Council has the power to "manage all economic affairs and enterprises of the [Tribe]" and to "adopt resolutions regulating the procedure" of tribal agencies and tribal officials.

103.    In 2019, the Tribal Business Council transferred ownership of MaxLend from Makes Cents to a new tribal corporation, Uetsa Tsakits. (Mayer Decl. ¶¶ 24, 26.) The Tribal Business Council's transfer of the ownership of MaxLend to Uetsa Tsakits is evidence of its ultimate authority and control over MaxLend.

104.    Indeed, the Bylaws of Uetsa Tsakits provides that the power to nominate, elect, and remove directors from the Uetsa Tsakits Board of Directors lies with the Tribal Business Council. (Mayer Decl. Ex. I (ECF No. 25-11), Article IV.) The Tribal Business Council also has the power to appoint the officers of Uetsa Tsakits. (*Id.*, Section 6.8.)

105.    According to Mayer, the former CEO of Makes Cents and the current CEO of Uetsa Tsakits, "The Nation is the sole owner of Uetsa Tsakits, and it is a commercial arm and subordinate economic instrumentality of the Nation." (Mayer Decl. ¶ 25.)

106.    Since 2013, MaxLend has been owned entirely, either directly or indirectly, by the Tribe.

107.    Mayer's declaration (ECF No. 25-2) claims that "Authority and control over Makes Cents and its operations remain at all times with Makes Cents' executive staff, its Board of Directors, and the Tribal Business Council." (*Id.* ¶ 39.)

108.    Mayer further claims that "Authority and control over Uetsa Tsakits likewise remain at all times with Uetsa Tsakits' executive staff, Board of Directors, and the Tribal Business Council." (*Id.* ¶ 40.)

109.    Although Plaintiffs maintain that the Tribal Defendants are not involved in the day-to-day management and operations of MaxLend, the Tribal Business Council's acquiescence in and facilitation of the illegal lending enterprise is a key component.

110.    MaxLend's involvement as the nominal lender of Plaintiffs' loans was part of a coordinated effort intended to enable Cane Bay Defendants to exploit Tribal sovereign immunity and shield usurious loans from perceived liability under state and federal law.

111.    Among other things, if the Tribal Defendants were enjoined from participating in the enterprise and collecting usurious amounts from consumers, it would effectively shut down the unlawful enterprise, including the ability of non-tribal participants to originate and collect on usurious loans through the tribal business model.

112.    Plaintiffs are not seeking any damages from the Tribal Defendants.

113.    Together, as the officials of the Tribal Business Council, the Board of Directors of Uetsa Tsakits, and the CEO of Uetsa Tsakits, the Tribal Defendants are responsible for and can stop the illegal conduct complained of herein, and, in their official capacities, have the power to comply with the law and provide the prospective relief Plaintiffs seek.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Manago (Maryland)**

114.    From her residence in Glen Burnie, Maryland, Plaintiff Glendora Manago applied for and took out a loan with MaxLend over the internet in February 2019.

115.    The loan was for $400 and had an interest rate of 605.58%.  According to the payment schedule, the finance charge on the loan was $1,436.20.  After the first month, the monthly payment on the loan was $209.34.  Plaintiff Manago paid the full amount on the loan, paying a total of $1,836.20 for a $400 loan.

116.    In December 2019, Plaintiff Manago took out another loan from MaxLend for $600.  The interest rate on that loan was 581.89% and the finance charge is $2,091.89.  Under Maryland law, the loan was void from inception.  Plaintiff has stopped making payments with a remaining unpaid balance.

**Plaintiff Peterson (Florida)**

117.    From her residence in West Palm Beach, Florida, Plaintiff Karen Peterson applied for and took out a loan with MaxLend over the internet in October 2018.

118.    The loan was for $350 and had an interest rate of 631.31%.  According to the payment schedule, the finance charge on the loan was $808.18.  After the first month, the bi-weekly payment on the loan was $96.51.  Plaintiff Peterson paid the full amount on the loan, paying a total of $1,158.18.

119.    On or around May 31, 2019, Peterson took out another loan from MaxLend for $500.  The interest rate on the loan was 560.97% and the finance charge was $1,501.34.  Plaintiff made payments of approximately $111.18 bi-weekly through November 15, 2019, before ultimately stopping payments with a remaining unpaid balance.

**Plaintiff Costa (Florida)**

120.    From her residence in Holiday, Florida, Plaintiff Diana Costa applied for and took out a loan with MaxLend over the internet in or around April 10, 2019.

121.    The loan was for $300, and had an interest rate and finance charge that would result in $1,012.68 additional amounts owed.  After the first month, the monthly payment on the loan was $150.85.  Plaintiff Costa paid approximately $860 towards the $300 loan, ultimately revoking her authorization to allow MaxLend access to her bank account.

122.    Plaintiff Costa had taken out a prior loan in September 20, 2018, also from her residence in Florida, for $425, with similar interest and finance charges, and a monthly payment of approximately $245.  Plaintiff Costa paid that loan in full, ultimately paying approximately $1,085.

**Plaintiff Hunter (Texas)**

123.    From her residence in Houston, Texas, Plaintiff Colleen Hunter applied for and took out a loan with MaxLend over the internet in or around October 2018.

124.    The loan was for approximately $500 and had a combined interest rate and finance charge that resulted in approximately $1,000 in additional amounts owed.  Plaintiff Hunter paid the full amount on the loan, paying a total of approximately $1,500.

125.    In or around May 2019, Plaintiff Hunter took out another loan from MaxLend for approximately $500.  Plaintiff Hunter made two payments on this loan, each about $150–$200 before ultimately stopping payments with a remaining unpaid balance.

**Plaintiff Davis (North Carolina)**

126.    From her residence in Salisbury, North Carolina, Plaintiff Sharon Davis applied for and took out a loan with MaxLend over the internet in or around July 2019.

127.    The loan was for approximately $300 and had a combined interest rate and finance charge that resulted in approximately $900 in additional amounts owed.  Plaintiff Davis paid the full amount on the loan, paying a total of approximately $1,200.

**Plaintiff Turner (Oregon)**

128.    From her residence in Portland, Oregon, Plaintiff Turner applied for and took out a loan with MaxLend over the internet in early 2019.  The loan was for approximately $400 and had a combined interest rate and finance charge that resulted in approximately $1,100 in additional amounts owed.  Plaintiff Turner paid off the loan in full, paying back approximately $1,500.

129.    In or around August 2019, also from her residence in Portland, Oregon, Plaintiff Turner applied for and took out a second loan with MaxLend for $875.  Plaintiff Turner made at least one payment, before ultimately stopping payments with a remaining unpaid balance.

**Plaintiff Vernon (Michigan)**

130.    From her residence in Southfield, Michigan, Plaintiff Camilla Vernon applied for and took out a loan with MaxLend over the internet in or around July 2018.

131.    The loan was for $600, and had an interest rate and finance charge that resulted in approximately $1,158 in amounts owed in addition to the principal.  The majority of the bi-weekly payments were approximately $148.  Plaintiff Vernon paid the full amount, paying a total of approximately $1,758.

132.    Plaintiff Vernon had previously taken out additional loans with MaxLend in 2017 with similar terms.

**Plaintiff Morris (South Carolina)**

133.    From her residence, which at the time was in Summerville, South Carolina, Plaintiff Lashaunya Morris applied for and took out a loan with MaxLend over the internet in July 2018.

134.    The loan was for $425 and had an interest rate of 763.84% and a finance charge of $1,177.59.  Plaintiff Morris paid back the principal amount of $425, and then stopped making payments.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs assert claims on behalf of the proposed National Class defined as follows:

> All United States residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.  This Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

136.    Plaintiff Manago asserts claims on behalf of the proposed Maryland Class defined as follows:

> All Maryland residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

137.    Plaintiffs Peterson and Costa assert claims on behalf of the proposed Florida Class defined as follows:

> All Florida residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

138.    Plaintiff Hunter asserts claims on behalf of the proposed Texas Class defined as follows:

> All Texas residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

139.    Plaintiff Davis asserts claims on behalf of the proposed North Carolina Class defined as follows:

> All North Carolina residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

140.    Plaintiff Turner asserts claims on behalf of the proposed Oregon Class defined as follows:

> All Oregon residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

141.    Plaintiff Vernon asserts claims on behalf of the proposed Michigan Class defined as follows:

> All Michigan residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

142.    Plaintiff Morris asserts claims on behalf of the South Carolina Class defined as follows:

> All South Carolina residents who entered into loan agreements with Makes Cents, Inc. or Uetsa Tsakits, Inc. (d/b/a MaxLend) within the applicable statute of limitations.

### A.    Numerosity

143.    There are hundreds or thousands of members of the Classes.  Thus, the Classes are so numerous that joinder of all members is impracticable.

### B.    Commonality

144.    There are numerous common questions of law and fact common to Plaintiffs and the members of the Classes.  These questions include, but are not limited to, the following:

a.    Whether Defendants violated state usury and consumer protection laws;

b.    Whether Defendants are protected by tribal sovereign immunity;

c.    Whether Defendants engaged in unfair or deceptive acts or practices;

d.    Whether Defendants constitute an "enterprise" under RICO;

e.    Whether Defendants violated RICO by charging interest rates more than the twice the legal limit under state law;

f.    The scope of any prospective relief; and

g.    The proper measure and amount of damages for the Classes.

**C.     Typicality**

145.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Plaintiffs, like members of the Classes, took out usurious loans from Defendants.  Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**D.     Adequacy**

146.    Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests that conflict with the Classes'.

**E.     Injunctive Relief**

147.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.  Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**F.     Predominance and Superiority**

148.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Additionally, individual actions

may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions.  Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.      Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.      It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.      A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.      The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.      Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Cane Bay Defendants)**

149.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

150.    Each Cane Bay Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

151.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Cane Bay, MaxLend, and Cane Bay Defendants' other

companies involved in the scheme, is in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender MaxLend.

152.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

153.    Cane Bay Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

154.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

155.    All of the loans made to the National Class members and collected by Cane Bay Defendants included an interest rate far in excess of twice the enforceable rate in their respective states.

156.    Cane Bay Defendants charged Plaintiffs interest rates in excess of the maximum rate allowed in their respective states knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiffs.

157.    Cane Bay Defendants' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent laws in Plaintiffs' respective states, and to collect interest at rates more than twice that allowed under those states' laws.

158.    Plaintiffs and the National Class members were injured as a result of Cane Bay Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

159.    This conduct began at the latest in 2013 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, South Carolina, and other states with similar usury laws.

160.    Accordingly, Cane Bay Defendants are jointly and severally liable to Plaintiffs and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

161.    Plaintiffs and the National Class seek an injunction ordering Cane Bay Defendants to divest themselves of any interest in the Enterprise, prohibiting Cane Bay Defendants from continuing to engage in the Enterprise, and ordering the dissolution of any entity associated with the Enterprise.

### SECOND CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Cane Bay Defendants)**

162.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

163.    Each Cane Bay Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

164.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Cane Bay, MaxLend, and Cane Bay Defendants' other companies involved in the scheme, is in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by

offering and collecting on loans to consumers throughout the United States through the online lender MaxLend.

165.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

166.    Cane Bay Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt.  Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

167.    This conduct began at the latest in 2013 and continues to date, and will be repeated again and again in the future, to the detriment of consumers in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, South Carolina, and other states with similar usury laws.

168.    Accordingly, Cane Bay Defendants are jointly and severally liable to Plaintiffs and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

169.    Plaintiffs and the National Class seek an injunction ordering Cane Bay Defendants to divest themselves of any interest in the Enterprise, including the receipt of racketeering profits, prohibiting Cane Bay Defendants from continuing to engage in the Enterprise, and ordering the dissolution of each entity that has engaged in the Enterprise.

**THIRD CAUSE OF ACTION**
**Violations of Maryland Consumer Loan Law**
**(On Behalf of Plaintiff Manago and the Maryland Class)**
**(Class Claims against Cane Bay Defendants)**

170.    Plaintiff Manago realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

171.     Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

> (i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;
>
> (ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan

Md. Code, Com. Law § 12-306(a)(6).[4]

172.     Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans.  Md. Code, Com. Law § 12-314.

173.     As set forth more fully above, in the course of making and collecting on loans to Plaintiff Manago and other consumers in Maryland, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

174.     Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff Manago and Maryland Class members.

175.     Cane Bay Defendants' violations were willful and intentional.

---

[4] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time."  Md. Code, Com. Law § 12-306.

176.    Plaintiff Manago and the Maryland Class are entitled to recover from Cane Bay Defendants any principal, interest, or other charges with respect to the loans, and any exemplary or treble damages as provided by law.

177.    Additionally, Plaintiff Manago and the Maryland Class seek an injunction enjoining Defendants from committing further violations of Maryland law.

**FOURTH CAUSE OF ACTION**
**Violation of Maryland Consumer Protection Act**
**(On Behalf of Plaintiff Manago and the Maryland Class)**
**(Class Claims against Cane Bay Defendants)**

178.    Plaintiff Manago realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

179.    Maryland law prohibits "unfair, abusive, or deceptive trade practices" in the extension of consumer credit.  Md. Code, Comm. Law § 13-303.

180.    Unfair, abusive, or deceptive trade practices include the "failure to state a material fact if the failure deceives or tends to deceive."  Md. Code., Comm. Law § 13-301(3).

181.    By engaging in a lending scheme in violation of Maryland law as described in this Complaint, Defendants engaged in unfair, abusive, or deceptive trade practices.

182.    By omitting that Defendants' loans are illegal in Maryland, Defendants violated the Maryland Consumer Protection Act.

183.    Cane Bay Defendants are thus liable to Plaintiff Manago and the Maryland Class members for their actual damages and attorneys' fees.  Md. Code, Comm. Law § 13-408.

184.    Additionally, Plaintiff Manago and the Maryland Class seek an injunction enjoining Defendants from committing further violations of Maryland law.

**FIFTH CAUSE OF ACTION**
**Violation of Florida Usury Law**
**(On Behalf of Plaintiffs Peterson & Costa, and the Florida Class)**
**(Class Claims against Cane Bay Defendants)**

185.    Plaintiffs Peterson and Costa reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

186.    All of the loans made by Defendants to Florida consumers used an interest rate greater than 18%.

187.    Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state."  Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than 18%.

188.    Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than 25%.  Such loans are "therefore void as against the public policy of the state as established by its Legislature."  *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

189.    Plaintiffs Peterson and Costa and members of the Florida Class are entitled to disgorgement of twice the amount of such usurious interest that was paid from the Cane Bay Defendants.  Fla. Stat. § 687.04.

**SIXTH CAUSE OF ACTION**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**(On Behalf of Plaintiffs Peterson & Costa, and the Florida Class)**
**(Class Claims against Cane Bay Defendants)**

190.    Plaintiffs Peterson and Costa reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

191.    The Florida Deceptive and Unfair Trade Practices Act prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

192.     By willfully engaging in the illegal lending scheme described in this Complaint, Defendants committed unfair or deceptive acts or practices.

193.     Plaintiff Peterson and Costa and the Florida Class members seek actual damages, injunctive relief, and attorneys' fees and costs from the Cane Bay Defendants.  Fla. Stat. § 501.211.

**SEVENTH CAUSE OF ACTION**
**Violation of Texas Usury Law**
**(On Behalf of Plaintiff Hunter and the Texas Class)**
**(Class Claims against Cane Bay Defendants)**

194.     Plaintiff Hunter realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

195.     Under Texas law, "[a] greater rate of interest than 10 percent a year is usurious unless otherwise provided by law."  Tex. Fin. Code § 302.001(b).

196.     A person who makes consumer loans and charges interest at a rate higher than 10% is required to hold a license.  Tex. Fin. Code §§ 342.005, .051.

197.     All of the loans made to Plaintiff Hunter and the Texas Class members were well in excess of the 10% maximum rate allowed under Texas law.

198.     At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the state of Texas.

199.     Defendants' conduct was not the result of an accidental and bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent Texas law, and to collect interest at rates well in excess of that allowed by the law.

200.     Accordingly, Plaintiff Hunter and the Texas Class members are entitled to the greater of (1) three times the interest charged in excess of 10%, or (2) the lesser of $2,000 or 20% of the principal from the Cane Bay Defendants.  Tex. Fin. Code § 305.001.

201.    Additionally, because Defendants charged Plaintiff Hunter and the Texas Class members interest at a rate twice the amount authorized by Texas law, Plaintiff Hunter and the Texas Class members are also entitled to recover the principal amount of the loan, interest, and any other charges or fees from the Cane Bay Defendants.  Tex. Fin. Code § 305.002.

202.    Alternatively, even if Defendants could take advantage of the higher interest rates permitted under Tex. Fin. Code § 342, *et seq*., Defendants charged Plaintiff Hunter and the Texas Class members interest in excess of the amount authorized by that law.

203.    Accordingly, Plaintiff Hunter and the Texas Class members are entitled to twice the amount of interest Defendants charged or received, plus reasonable attorneys' fees from the Cane Bay Defendants.  Tex. Fin. Code § 349.001(a).  Additionally, because Defendants charged Plaintiff Hunter and the Texas Class members interest at a rate twice the amount authorized by Texas law, Plaintiff Hunter and the Texas Class members are entitled to the principal balance in addition to interest from the Cane Bay Defendants.  Tex. Fin. Code § 349.002.

**EIGHTH CAUSE OF ACTION**
**Violation of Texas Deceptive Trade Practices Act**
**(On Behalf of Plaintiff Hunter and the Texas Class)**
**(Class Claims against Cane Bay Defendants)**

204.    Plaintiff Hunter realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

205.    The Texas Deceptive Trade Practices Act prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Comm. Code § 17.46(a).

206.    Defendants' conduct described in this Complaint constitutes "unconscionable actions or courses of action" as set forth in Tex. Bus. & Comm. Code § 17.50(a)(3).

207.     Accordingly, Plaintiff Hunter and the Texas Class members are entitled to actual damages, treble damages, injunctive relief, attorneys' fees and costs from the Cane Bay Defendants.  Tex. Bus. & Comm. Code § 17.50(b).

### NINTH CAUSE OF ACTION
**Violation of North Carolina Usury Law**
**(On Behalf of Plaintiff Davis and the North Carolina Class)**
**(Class Claims against Cane Bay Defendants)**

208.     Plaintiff Davis realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

209.     The maximum legal interest rate chargeable to consumers under North Carolina law is 8%.  N.C. Gen. Stat. § 24-1.

210.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

211.     All of the loans made to Plaintiff Davis and the North Carolina Class were well in excess of the maximum rates allowed under North Carolina law.

212.     Defendants' conduct in doing so was knowing, deliberate, intentional, and willful.  Defendants' purpose was to take more than the legal rate of interest for the money loaned to the Plaintiff Davis and members of the North Carolina Class.

213.     Because Defendants' violations were willful, Plaintiff Davis and the North Carolina Class are entitled to forfeiture of the entire amount of interest owed and may recover twice the amount of the interest paid from the Cane Bay Defendants.  N.C. Gen. Stat. § 24-2.

## TENTH CAUSE OF ACTION
### Violation of North Carolina Consumer Finance Act
### (On Behalf of Plaintiff Davis and the North Carolina Class)
### (Class Claims against Cane Bay Defendants)

214.    Plaintiff Davis realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

215.    North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than permitted by North Carolina's general usury laws without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. § 53-166(a).

216.    A person who fails to comply with the CFA's requirements "shall be guilty of a Class 1 misdemeanor."  N.C. Gen. Stat. § 53-166(c).  Moreover, "[a]ny contract of loan, the making or collecting of which violates any provision of [the CFA] . . . except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id*. § 53-166(d).

217.    All of the loans made to Plaintiff Davis and the North Carolina Class were $15,000 or less and in excess of the maximum rates allowed under North Carolina law.

218.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of North Carolina.  As a result, the conduct at issue herein is both unlawful and criminal.

219.    Defendants' conduct was not the result of an accidental or bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent North Carolina law and to collect interest at rates well in excess of that allowed under the law.  Plaintiff Davis and members of the North Carolina Class are entitled to a declaration that such loans are void.

220.    Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Davis and members of the North Carolina Class are entitled to restitution of all amounts paid to Cane Bay Defendants.

## ELEVENTH CAUSE OF ACTION
### Violation of North Carolina Unfair Trade Practices Act
### (On Behalf of Plaintiff Davis and the North Carolina Class)
### (Class Claims against Cane Bay Defendants)

221.    Plaintiff Davis realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

222.    The North Carolina Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1.

223.    By willfully engaging in the illegal lending scheme described in this Complaint, Defendants committed unfair or deceptive acts or practices.

224.    Plaintiff Davis and the North Carolina Class members seek actual damages, treble damages, injunctive relief, and attorneys' fees and costs from the Cane Bay Defendants. N.C. Gen. Stat. § 75-16.

## TWELFTH CAUSE OF ACTION
### Violation of Oregon Usury Law
### (On Behalf of Plaintiff Turner and the Oregon Class)
### (Class Claims against Cane Bay Defendants)

225.    Plaintiff Turner realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

226.    All of the loans made by Defendants to Oregon consumers used an interest rate greater than 36%.

227.    Defendants were not licensed to make loans in Oregon.

228.    Under Oregon law, Defendants were barred from making the loans in the first instance, and from collecting the interest greater than the legal rate. ORS 725.045; ORS 82.010(4).

229.     Plaintiff Turner and the Oregon Class seek recovery of all principal and interest collected from the Cane Bay Defendants and an injunction enjoining Defendants from committing further violations of Oregon law.

### THIRTEENTH CAUSE OF ACTION
**Violation of Michigan Usury Law**
**(On Behalf of Plaintiff Vernon and the Michigan Class)**
**(Class Claims against Cane Bay Defendants)**

230.     Plaintiff Vernon realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

231.     All of the loans made by Defendants to Michigan consumers used an interest rate greater than 25%.

232.     Defendants were not licensed to make loans in Michigan.  Under Michigan law, Defendants were barred from collecting any interest on the loans.  MCL 438.32.

233.     Plaintiff Vernon and the members of the Michigan Class seek disgorgement of any illegal interest collected from the Cane Bay Defendants and injunctive relief.

### FOURTEENTH CAUSE OF ACTION
**Violation of Michigan Consumer Protection Act**
**(On Behalf of Plaintiff Vernon and the Michigan Class)**
**(Class Claims against Cane Bay Defendants)**

234.     Plaintiff Vernon realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

235.     The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" including:

- Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction;

- Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction;

- Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it;

- Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

MCL §§ 445.903 (n), (o), (t), (z).

236.    By engaging in the lending scheme described in this Complaint, Defendants violated the aforementioned sections of the Michigan Consumer Protection Act.

237.    Plaintiff Vernon and the members of the Michigan Class seek actual damages, injunctive relief, attorneys' fees, and costs from the Cane Bay Defendants. MCL § 445.911.

**FIFTEENTH CAUSE OF ACTION**
**Violation of South Carolina Usury Law**
**(On Behalf of Plaintiff Morris and the South Carolina Class)**
**(Class Claims against Cane Bay Defendants)**

238.    Plaintiff Morris realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

239.    All of the loans made by Defendants to South Carolina consumers used an interest rate greater than 15% of the principal.

240.    Additionally, Defendants were never licensed by the state of South Carolina.

241.    Defendants made these unlawful loans in willful violation of South Carolina law, and Plaintiff Morris and the South Carolina Class members seek disgorgement of all illegally collected interest from the Cane Bay Defendants, and injunctive relief.

**SIXTEENTH CAUSE OF ACTION**
**Violation of South Carolina Unfair Trade Practices Act**
**(On Behalf of Plaintiff Morris and the South Carolina Class)**
**(Class Claims against Cane Bay Defendants)**

242.     Plaintiff Morris realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

243.     The South Carolina Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. Code § 39-5-20.

244.     By willfully engaging in the illegal lending scheme described in this Complaint, Defendants committed unfair or deceptive acts or practices.

245.     Plaintiff Morris and the South Carolina Class members seek actual damages, treble damages, injunctive relief, and attorneys' fees and costs from the Cane Bay Defendants.  S.C. Code § 39-5-140.

## SEVENTEENTH CAUSE OF ACTION
### Unjust Enrichment
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Cane Bay Defendants)**

246.     To the detriment of Plaintiffs and the National Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Plaintiffs and National Class members.

247.     As between the parties, it would be unjust for Cane Bay Defendants to retain the benefits attained by their actions.  Accordingly, on behalf of themselves and members of the National Class, Plaintiffs seek a full accounting and restitution of Cane Bay Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## EIGHTEENTH CAUSE OF ACTION
### Civil Conspiracy
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Cane Bay Defendants)**

248.    All of the loans to consumers made in the name of Defendants' lending company MaxLend violated Plaintiffs and the National Class members' respective states' interest rates and lending laws.

249.    Defendants conspired amongst themselves and with other actors to violate state usury and lending laws and profit from those violations.

250.    Accordingly, on behalf of themselves and the members of the National Class, Plaintiffs seek to recover from Cane Bay Defendants, jointly and severally, all amounts repaid on any loans with Defendants.

**NINETEENTH CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(c)-(d)**
**(On Behalf of Plaintiffs and the National Class)**
**(Class Claims against Tribal Defendants in their official capacities)**

251.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

252.    Defendants Richard Mayer, Mark Fox, Spotted Bear, Turner-Lone Fight, Packineau, Brugh, Fred Fox, Monica Mayer, Rabbithead, Blacksmith, and Eilson are each being sued in their official capacities as members of the MHA Nation Tribal Business Council and/or as officers or directors of Uetsa Tsakits, Inc., and will be referred to collectively as the "Tribal Defendants."

253.    Each of the Tribal Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

254.    The Enterprise, consisting of the Tribal Defendants, and the Cane Bay Defendants, and the unnamed officers, executives, and other employees of these companies and the Cane Bay Defendants' other companies, is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4),

associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

255.    The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

256.    The Tribal Defendants violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

257.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was uncured in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

258.    All of the loans made to National Class members and collected by the Enterprise and others, included interest rates far in excess of twice the enforceable rate in the Class members' states.

259.    Plaintiffs and National Class members were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(c), by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

260.    This conduct began sometime in 2013, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

261.    The Tribal Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt.  Each of the Tribal Defendants knowingly and willfully agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

262.     Plaintiffs and the National Class were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(d) by, among other thing, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

263.     This conduct began sometime in 2013, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

264.     The Tribal Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, procuring proceeds from the Enterprise, and willfully investing money in the Enterprise for the purpose of the unlawful scheme.

265.     Plaintiffs seek prospective injunctive and declaratory relief for the Tribal Defendants' conduct, including an order: (1) barring the Tribal Defendants from continuing to make loans to consumers that exceed the legal interest rates for consumers residing in each state; (2) prohibiting Tribal Defendants from continuing to collect on the unlawful loans; (3) requiring Tribal Defendants to ensure that all accounts are deleted from consumers' credit reports; and (4) requiring the Tribal Defendants to send notice to consumers explaining that their loans are void and unenforceable.

**TWENTIETH CAUSE OF ACTION**
**Declaratory Judgment, 28 U.S.C. § 2201**
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against Tribal Defendants in their official capacities)**

266.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

267.     Maryland, Florida, Texas, North Carolina, Oregon, Michigan, South Carolina, and many other states require all who engage in the business of making small loans to be licensed.

268.     Defendants were not licensed to make loans in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, South Carolina, or any other state in the United States.

269.     Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, South Carolina, and many other states.

270.     In addition to licensing violations, Defendants' loans violated the general usury laws of many states including Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina.  Thus, the loans violated the general usury statutes of many states and are void pursuant to those laws.

271.     Further, the lending agreements used for Plaintiffs' loans contained unconscionable choice of law and forum selection provisions that are void and unenforceable.

272.     Because of the triple digit interest rates, certain Plaintiffs with unpaid balances are subject to significant liability as the interest accrues on their unpaid debts.

273.     MaxLend's privacy policy states that MaxLend shares personal information with credit bureaus and that consumers cannot limit this sharing.

274.     MaxLend, under the control of Tribal Defendants, and/or third-party debt collectors have reported each Plaintiff's and each member of the State Classes' MaxLend loan to the credit bureaus.

275.     MaxLend reports loan information to credit bureaus, including consumer reporting agency FactorTrust.

276.     Plaintiffs' and members of the State Classes' loans from MaxLend are thus subject to being reported to credit bureaus wherein such reporting reflects any late payments and accrual of significant liability as interest accrues according to the unlawful triple digit interest rates.

277.    Plaintiffs and members of the State Classes have been and continue to be harmed by the inclusion of the unlawful loans from MaxLend on credit reports, and they will continue to be harmed until loans are deleted from their credit reports as void and unenforceable.

278.    Resolution of the validity and enforceability of the outstanding balance on Plaintiffs' loan agreements by this Court will determine the rights and interests of the parties to their respective agreements.

279.    Thus, the validity and enforceability of Plaintiffs' loan agreements, including but not limited to any outstanding balances, presents a substantial, non-speculative controversy between parties with adverse legal interests of sufficient immediacy and reality.

280.    Accordingly, Plaintiffs, on behalf of themselves and the members of the State Classes, seek a determination that their loans are void and unenforceable, and that they are not obligated to pay any principal and/or interest outstanding on the illegal loans under their respective state laws.

<u>TWENTY-FIRST CAUSE OF ACTION</u>
**Violations of State Law**
**(On Behalf of Plaintiffs and All State Classes)**
**(Class Claims against Tribal Defendants in their official capacity for prospective relief)**

281.    Plaintiffs reallege and incorporates by reference each and every allegation set forth in the preceding paragraphs.

282.    As alleged herein, Plaintiffs and other consumers in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina applied for and took out loans with MaxLend, which they maintain are void and unenforceable because they violated each state's licensing and usury laws.

283.    MaxLend's privacy policy states that MaxLend shares personal information with credit bureaus and that consumers cannot limit this sharing.

284.     MaxLend, under the control of Tribal Defendants, and/or third-party debt collectors have reported each Plaintiff's and member of the State Classes' MaxLend loan to the credit bureaus.

285.     MaxLend reports loan information to credit bureaus, including consumer reporting agency FactorTrust.

286.     Plaintiffs' and the members of the State Classes' loans from MaxLend are thus subject to being reported to credit bureaus wherein such reporting reflects any late payments and accrual of significant liability as interest accrues according to the unlawful triple digit interest rates.

287.     Because the MaxLend loans are null and void according to Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina laws, they should be deleted from Plaintiffs' and members of the State Classes' credit reports.

288.     Plaintiffs and members of each of the State Classes have been and continue to be harmed by the inclusion of the unlawful loans from MaxLend on their credit reports, and they will continue to be harmed until the void and unenforceable loans are deleted from their credit reports.

289.     Certain Plaintiffs have outstanding balances on their MaxLend loans.

290.     Because of the usurious interest rates charged by MaxLend, Plaintiffs and other consumers in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina are subject to significant liability as the interest accrues on their unpaid debts.

291.     Accordingly, Plaintiffs, on behalf of themselves and all State Classes, seek injunctive relief from Tribal Defendants, including but not limited to an order: (1) prohibiting Tribal Defendants from continuing to collect on the illegal loans in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina; (2) requiring Tribal Defendants to send

notices to Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina consumers explaining that their loans are void and unenforceable; (3) requiring Tribal Defendants to ensure that all accounts are deleted from Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina consumers' credit reports; and (4) prohibiting Tribal Defendants from selling the unlawful loans to consumers in Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina to third-party debt collectors.

292.    Plaintiffs, on behalf of themselves and all others similarly situated, further seek a determination that they are not obligated to pay any principal and/or interest outstanding on the illegal loans.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.    An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.    An Order declaring that Defendants have committed the violations of law alleged herein;

D.    An Order providing for any and all injunctive relief the Court deems appropriate;

E.    An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing

sums;

H.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including

attorneys' fees; and

I.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Date: December 15, 2020              /s/John G. Albanese_____

Martin E. Wolf, (Bar No. 09425)
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

John Parron*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
jparron@bm.net

Sophia Rios*
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Telephone: (858) 252-6649
Facsimile: (215) 875-4604

srios@bm.net

*pro hac vice*

*Attorneys for Plaintiffs and Proposed Classes*