IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GLENDORA MANAGO, *et al.*, on behalf of themselves and all others similarly situated,<br>    *Plaintiffs*,<br><br>v.<br><br>CANE BAY PARTNERS VI, LLLP *et al.*,<br>    *Defendants*. | Civil Action No. ELH-20-0945 |

**MEMORANDUM**

    This class action concerns an alleged usurious lending scheme by a tribal entity. The Memorandum resolves a motion to stay filed by the defense, pending a decision by the Court of Appeals for the Fourth Circuit in the case of *Hengle v. Asner*, Case No. 20-1061.

    Plaintiffs Glendora Manago, Karen Peterson, Diana Costa, Colleen Hunter, Sharon Davis, Leslie Turner, Camilla Vernon, and Lashaunya Morris filed suit against a host of defendants based on, *inter alia*, on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. ECF 1 (the "Complaint"); ECF 40 ("Amended Complaint"). Their claims involve a non-party lender, Makes Cents, Inc. d/b/a MaxLend ("Makes Cents" or "MaxLend"), an entity formed under the laws of the Mandan, Hidasta, and Arikara Nation (the "Tribe" or "MHA Nation"), a federally recognized Native American tribe in North Dakota.[1] The defendants are Cane Bay Partners VI, LLLP ("Cane Bay Partners") and its co-founders and officers, David Johnson and Kirk Chewning (collectively, the "Cane Bay Defendants"); Richard Mayer, Karen Rabbithead, David Blacksmith, and Wesley Scott Wilson (collectively, the "Tribal Lending Defendants"); and

---

[1] In 2019, the Tribe transferred ownership of the loan portfolio from Makes Cents to Uestka Tsakits, Inc., a newly created tribal corporation. ECF 73-1 at 3 n.2.

Mark Fox, Cory Spotted Bear, Sherry Turner-Lone Fight, Mervin Packineau, V. Judy Brugh, Fred Fox, and Monica Mayer (collectively, the "Tribal Business Council Defendants"). The Tribal Lending Defendants and the Tribal Business Council Defendants (collectively, the "Tribal Defendant")  are all members of the MHA Nation.

Plaintiffs allege that defendants violated RICO as well as various states' usury laws and consumer protection statutes, were unjustly enriched and engaged in civil conspiracy. They bring claims on behalf of themselves and a national class of United States residents who entered into loan agreements with MaxLend, and subclasses comprised of the respective residents of each state where the named plaintiffs reside. ECF 40, ¶¶ 135-42. Plaintiffs seek compensatory and treble damages, disgorgement of illegal gains, injunctive relief, and attorneys' fees and costs from the Cane Bay Defendants and injunctive and declaratory relief from the Tribal Defendants in their official capacities only.

Cane Bay Defendants and Tribal Lending Defendants have filed a motion to stay (ECF 73), pending the decision by the Fourth Circuit in *Hengle v. Asner*, Case No. 20-1061.  *See Hengle v. Asner*, 433 F. Supp. 3d 825, 838–39 (E.D. Va. 2020), *motion to certify appeal granted*, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020). The motion is supported by a memorandum of law. ECF 73-1 (collectively, the "Motion"). The Tribal Business Council Defendants have expressed their support for the Motion in a separate filing. *See* ECF 75.

According to the Cane Bay Defendants and the Tribal Lending Defendants, *Hengle*, another case about an allegedly usurious tribal lending scheme, is highly relevant here because it may determine "(i) whether private plaintiffs can sue tribal officials in their official capacities pursuant to *Ex parte Young* based on alleged violations of state law; and (ii) whether RICO authorizes private plaintiffs to seek injunctive relief." ECF 73-1 at 10; *Ex parte Young*, 209 U.S.

2

123 (1908).[2] The Fourth Circuit heard argument in *Hengle* on January 26, 2021. ECF 73-1 at 5. Plaintiffs oppose the Motion. ECF 76 (the "Opposition"). Defendants have replied. ECF 81 (the "Reply").

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons discussed below, I shall grant the Motion.

## I.  Background[3]

Beginning in 2013, MaxLend began offering high-interest short term loans that charged up to 841.4532% annual interest on short term loans of up to $2,500. ECF 40, ¶ 85. These loans are "purportedly governed by tribal law" because MaxLend "purports to be" controlled by the Tribe. *Id.* ¶¶ 85, 86. Plaintiffs are residents of Maryland, Florida, Texas, North Carolina, Oregon, Michigan, and South Carolina, who obtained loans from MaxLend via the internet. *Id.* ¶¶ 114-134.

According to plaintiffs, "on its website and in its contract," MaxLend "purports to be an entity controlled" by the Nation, but "in reality, [it] is merely a front for Johnson's and Chewning's business which is operated through non-tribal entity Cane Bay Partners and other non-tribal companies associated with Johnson and Chewning." *Id.* ¶ 86. Johnson, Chewning, and Cane Bay allegedly run MaxLend's lending business and the MHA Nation has "little meaningful involvement in the business." *Id.* ¶ 87. In fact, plaintiffs claim that the MHA Nation "receives little financial benefit from the lending scheme." *Id.* ¶ 100.

---

[2] Under the case of *Ex parte Young*, "private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law." *Allen v. Cooper,* 895 F.3d 337, 354 (4th Cir. 2018), *aff'd*, ___ U.S. ___, 139 S.Ct. 2664 (2020). Of relevance here, it is well settled that *Ex parte Young* applies only to "suits seeking declaratory and injunctive relief against state officers in their official capacities." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997).

[3] The factual allegations are limited to those facts relevant to the Motion.

But, according to plaintiffs, the Tribal Defendants' "acquiescence in and facilitation of the illegal lending enterprise is a key component" of the scheme. *Id.* ¶ 109. Therefore, plaintiffs posit that "if the Tribal Defendants were enjoined from participating in the enterprise and collecting usurious amounts from consumers, it would effectively shut down the unlawful enterprise…." *Id.* ¶ 111.

Manago filed suit against the Cane Bay Defendants on April 13, 2020. After several extensions granted by consent (ECF 14, ECF 22; ECF 24), the Cane Bay Defendants filed three motions to dismiss on November 10, 2020. ECF 25; ECF 28; ECF 29. Plaintiff filed an Amended Complaint on December 15, 2020. ECF 40. The Amended Complaint added seven plaintiffs, eleven defendants, and fifteen additional causes of action, alleging violations of similar laws from seven different states.

Cane Bay and Tribal Lending Defendants filed this Motion and a motion to stay their responsive pleading deadline. ECF 74. By Order of February 12, 2021, I granted defendant's request to stay the deadline to respond to the Amended Complaint pending the resolution of this Motion. ECF 80.

## II.   Discussion

### A.

A district court has broad discretion to stay proceedings as part of its inherent power to control its own docket. *Landis v. North American*, 299 U.S. 248, 254 (1936). But, that discretion is not without limits. *In re Sacramento Mun. Utility Dist.*, 395 Fed. App'x. 684, 687 (Fed. Cir. 2010). A court must "weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 255; *see also United States v. Ga. Pac. Corp.*, 562 F.2d 294, 296 (4th Cir. 1977) ("The determination by a district judge in granting or denying a motion to stay proceedings calls for an

4

exercise of judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket.").

"When considering a discretionary motion to stay, courts typically examine three factors: (1) the impact on the orderly course of justice, sometimes referred to as judicial economy, measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected from a stay; (2) the hardship to the moving party if the case is not stayed; and (3) the potential damage or prejudice to the non-moving party if a stay is granted." *Int'l Refugee Assistance Project v. Trump*, 323 F. Supp. 3d 726, 731 (D. Md. 2018); *see CX Reinsurance Co. Limited v. Johnson*, GJH-18-2355, 2020 WL 406936, at *3 (D. Md. Jan. 24, 2020). Additionally, courts consider the length of the requested stay and whether proceedings in another matter involve similar issues. *See Stone v. Trump*, 402 F. Supp. 3d 153, 160 (D. Md. 2019); *Popoola v. MD-Individual Practice Ass'n*, DKC-2000-2496, 2001 WL 579774, at *2 (D. Md. May 23, 2001).

In order to issue a stay, a court must be satisfied that a "pressing need" exists, and that "the need for a stay outweighs any possible harm to the nonmovant." *Elite Const. Team, Inc. v. Wal-Mart Stores, Inc.*, JKB-14-2358, 2015 WL 925927, at *3 (D. Md. Mar. 2, 2015). Significantly, "[t]he party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus, Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).

**B.**

As noted, defendants contend that the issues presented in *Hengle*, 433 F. Supp. 3d 825, are substantially similar to those in this litigation, such that the decision by the Fourth Circuit will prove helpful in resolving this case.

*Hengle* involves a lending scheme similar to that alleged in this action. The plaintiffs, Virginia residents, sued various tribal officials and two non-tribal individuals alleged to be involved in a usurious lending scheme. In particular, plaintiffs alleged that the non-tribal defendants paid the Native American tribe to facilitate a scheme by which the tribe established several tribally-owned lending entities to serve as the nominal lender for loans to Virginia consumers, with interest rates up to 919%. *Id.* at 841-42. Plaintiffs asserted claims based on RICO and Virginia's Consumer Finance Act, and sought a declaratory judgment against the tribal officials. They sought to enjoin the tribal officials from collecting on the allegedly usurious loans and to prevent the tribal lending entities from issuing loans to Virginia consumers in the future. *Id.* at 839. Plaintiffs also sought monetary relief against the non-tribal defendants. *Id.*

The tribal officials in *Hengle* moved to dismiss. Among other grounds, they asserted lack of subject matter jurisdiction, based on sovereign immunity. *Id.* at 871. The district court held that sovereign immunity did not bar plaintiffs' claims against the tribal officials. The court reasoned that plaintiffs could pursue the state law claims against the tribal officials pursuant to *Ex parte Young* based on the Supreme Court's decision in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014). *See Hengle*, 433 F. Supp. 3d at 872-875.

*Bay Mills* addressed a gaming compact between Michigan and the Bay Mills Indian Community that was executed pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* Under the IGRA, Bay Mills could conduct certain gaming activities on Indian lands, but could not conduct such activities on non-Indian lands. *Bay Mills*, 572 U.S. at 786. In 2010, Bay Mills began operating a gaming facility on non-Indian land that it had purchased using an appropriation from Congress. *Id.* The congressional appropriation provided that any land acquired using the funds "shall be held as Indian lands are held." *Id.* (internal quotations and

citations omitted). Therefore, Bay Mills argued that the previously non-Indian land became Indian land under the compact, permitting the operation of gaming facilities on that land. *Id.* Michigan disagreed and sued Bay Mills in federal court to enjoin the operation of a casino on the new land. *Id.* at 787. The Supreme Court held that IGRA abrogated tribal sovereign immunity only for gaming activities on Indian lands. *Id.* at 791-97.

Of particular relevance here, the *Bay Mills* Court also stated that "if Bay Mills went ahead [with operating an unlicensed casino] anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license" in violation of state law. *Id.* at 796 (citing Mich. Comp. Laws Ann. §§ 432.220, 600.3801(1)(a)). The Court said: "As this Court has stated before, analogizing to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Bay Mills*, 572 U.S. at 796.

The District Court in *Hengle* noted that the Fourth Circuit had not yet considered whether the language in *Bay Mills,* "opining that Michigan could seek to enjoin tribal officials for violations of state law pursuant to *Ex parte Young* – constitutes mere dictum…." *Hengle*, 433 F. Supp. 3d at 873. But, it explained that other courts have taken up the question and concluded "that *Bay Mills* permits *Ex parte Young*-style claims against tribal officials for violations of state law that occur on non-Indian lands." *Id.* at 874 (citing, *inter alia*, *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 122-24 (2d Cir. 2019)). The court concluded that, "[t]o hold otherwise would allow '[t]ribes and their officials…, in conducting affairs outside of reserved lands, to violate state laws with impunity.'" *Hengle*, 433 F. Supp. 3d at 875 (quoting *Gingras*, 922 F.3d at 124) (alterations in *Hengle*).

7

Also of relevance, the court held that plaintiffs could not pursue their RICO claim against the tribal officials because RICO only provides private plaintiffs with a right to monetary damages, not injunctive or declaratory relief. And, *Ex parte Young* only allows for injunctive relief. *Id.* at 880-86.

As of right, the tribal officials appealed the district court's decision as to the order denying the motion to dismiss on the issue of sovereign immunity. The defendants also moved for leave to appeal other aspects of the court's decision under 28 U.S.C. § 1292. Of relevance here, the district court certified for interlocutory appeal, *sua sponte*, the question of "whether RICO permits *Ex parte Young*-style relief against the Tribal Officials." *Hengle v. Asner*, No. 19-250, 2020 WL 85970, at *10-11 (E.D. Va. Feb. 20, 2020).

In sum, there are two questions on appeal in *Hengle* that are relevant to this case: 1) whether private plaintiffs can enjoin tribal officials in their officials capacities based on alleged violations of state law, pursuant to *Ex parte Young*; and 2) whether private plaintiffs may seek "*Ex parte Young*-style" prospective relief under RICO.

The appeal is fully briefed. As noted, the Fourth Circuit heard oral argument on January 26, 2021. *See* Case No. 20-1062 (4th Cir.).

## C.

In determining whether to stay this case, I must weigh the interests of judicial economy, the hardship to the movants if the stay is not granted, and the burden on the nonmovant if the stay is granted.

The Cane Bay Defendants and the Tribal Lending Defendants argue, ECF 73-1 at 10: "Two issues critical to the *Ex parte Young* inquiry this Court must conduct here are squarely before the Fourth Circuit in *Hengle*: (i) whether private plaintiffs can sue tribal officials in their official

8

capacities pursuant to *Ex parte Young* based on alleged violations of state law; and (ii) whether RICO authorizes private plaintiffs to seek injunctive relief." According to defendants, the Fourth Circuit's resolution of these issues could control the disposition of this case as to at least some of the defendants. *Id.*

In particular, they posit: "[I]f the Fourth Circuit finds in *Hengle* both that (i) *Ex parte Young* claims can only be brought against tribal officials for violations of federal law (or only states can assert state law *Ex parte Young* claims against tribal officials) and (ii) RICO does not permit private plaintiffs to assert claims for injunctive relief, then *all* of Plaintiffs' claims against the Tribal Defendants in this case must be dismissed" because RICO is the "only substantive federal claim Plaintiffs have asserted against Tribal Defendants." *Id.* (Emphasis in original).

In the view of the Cane Bay Defendants and the Tribal Lending Defendants, a stay advances the policy behind judicial economy because the Fourth Circuit's decision will "almost certainly impact this Court's rulings and will likely require additional briefing by both sides." *Id.* at 13-14. Further, they assert that proceeding without a stay will prejudice defendants because it would "force the Tribal Defendants to defend this case" even though they might be entitled to immunity. *Id.* at 14-15. And, they posit that plaintiffs will not suffer any prejudice if the matter is stayed. Rather, they claim that a stay would spare all of the litigants, including plaintiffs, of having to amend or supplement their briefing to address the Fourth Circuit's decision. *Id.* at 15-16.

In the Opposition, plaintiffs assert that "there is only a theoretical possibility that the Fourth Circuit's decision in *Hengle* will substantially impact the issues" defendants' raise. ECF 76 at 11. And, they believe that the impact will be narrow. *Id.* They also argue that the Fourth Circuit is not likely to conclude that *Ex parte Young* actions against tribal officials for violations of state law are improper. *Id.* at 12-14.

Moreover, in plaintiffs' view, the balance of harms weighs against a stay. ECF 76 at 17. They posit that the only possible burden defendants "may avoid with a stay is submitting supplemental briefs on these targeted issues should the Fourth Circuit decision require it." *Id.* at 19. In contrast, plaintiffs assert that they will be unduly prejudiced by the delay because they are "continuing to suffer harm from Defendants' fraudulent and illegal conduct." *Id.* at 21. And, there is no guaranteed date by which the Fourth Circuit will issue its opinion. *Id.*

The Cane Bay Defendants and the Tribal Lending Defendants counter that "the balance of hardships favor a short stay." ECF 81 at 8. They posit that plaintiffs "manufacture prejudice to themselves," but they cannot "allege that Makes Cents (or any Defendant) is actively seeking to collect on their loans," given plaintiffs' allegations "that they have either paid off their loans in full, stopped making payments on their loans, or revoked authorization for Makes Cents to access the bank account." *Id.* at 21 (citing ECF 40, ¶¶ 114-134, 272).

### E.

In my view, a stay in anticipation of the Fourth Circuit's decision in *Hengle* is reasonable. As noted, oral argument occurred on January 26, 2021. Therefore, the court will likely issue its decision in the next few months. Thus, any stay would be relatively short and, even assuming that delay does not favor plaintiffs, it would be brief.

Further, there are two questions on appeal that will have direct implications on threshold issues in this case. I cannot speculate on the likelihood of the outcome of the Fourth Circuit's decision, as both parties seem to urge. But, it seems likely that the Fourth Circuit's decision will provide at least some guidance as to the Court's jurisdiction over at least some of the defendants in the case. And, it may materially impact the scope of the suit.

Notably, plaintiffs' allegations reveal that the loans are not ongoing. Moreover, in view of the numerous, complex issues in this case, it is in the interest of judicial efficiency to await the Fourth Circuit's decision in *Hengle*, so the parties can integrate the precedent into their briefing and this Court can consider the appellate court's analysis. Further, any stay would be of relatively short duration.

### III. Conclusion

For the aforementioned reasons, I will grant the Motion. The deadline to respond to the Amended Complaint will be stayed pending the Fourth Circuit's decision in *Hengle.* Defendants are directed to respond to the Amended Complaint within 17 days following the Fourth Circuit's issuance of the mandate in *Hengle.*

A separate Order follows.


Date: April 8, 2021  /s/
Ellen L. Hollander
United States District Judge